# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JESSIE R. SPENCER,⁣ )
⁣ )
⁣      **Plaintiff,** )
⁣ )     **CIVIL ACTION**
**v.** )     **No. 09-2001-KHV**
⁣ )
**THE GOODYEAR TIRE** )
**AND RUBBER COMPANY,** )
⁣ )
⁣      **Defendant.** )
_____)

## MEMORANDUM AND ORDER

Jessie R. Spencer brings suit against The Goodyear Tire and Rubber Company under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Specifically plaintiff contends that Goodyear took adverse employment actions against him because of race and/or in retaliation for protests of race discrimination. Plaintiff also contends that co-workers and supervisors subjected him to a racially hostile work environment. See Pretrial Order (Doc. #25) filed August 26, 2009. This matter comes before the Court on defendant's Motion For Summary Judgment (Doc. #37) filed September 28, 2009 and Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #52) filed December 7, 2009. For reasons stated below, the Court sustains the motion for leave to file a surreply and sustains the motion for summary judgment in part.

## I.    Plaintiff's Motion For Leave To File A Surreply

Plaintiff has filed a surreply which alleges that defendant's reply raises new arguments which necessitate a response. Under D. Kan. Rule 7.1(b), parties are permitted to file a dispositive motion, a response and a reply. Surreplies are typically not allowed. See Stevens v. Deluxe Fin. Servs., Inc., 199 F. Supp.2d 1128, 1130 (D. Kan. 2002); Metzger v. City of Leawood, 144 F. Supp.2d 1225, 1266

(D. Kan. 2001). On the other hand, Rule 56(c), Fed. R. Civ. P., requires that the nonmoving party receive notice and a reasonable opportunity to respond to movant's summary judgment materials. Thus, when a reply advances new reasons or evidence in support of a motion for summary judgment, the nonmoving party should have an opportunity to respond. If the district court grants summary judgment for movant without relying on new materials and arguments in the reply brief, however, it may preclude a surreply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1164 (10th Cir. 1998) (court may either permit surreply or refrain from relying on new material in reply brief). In this case the Court will allow plaintiff's surreply and consider the arguments presented therein.

## II.    Motion For Summary Judgment

Defendant seeks summary judgment on all of plaintiff's claims. Specifically, defendant argues that (1) plaintiff presents evidence of four incidents of racial language over more than one year of employment, which is insufficient to establish a racially hostile work environment under Title VII and Section 1981; (2) plaintiff's hostile work environment claim is barred because plaintiff did not follow defendant's policies and complaint procedures to remedy racial harassment; (3) plaintiff does not establish a prima facie case of disparate treatment or retaliation because his work performance was unsatisfactory and he offers no evidence that defendant treated similarly-situated Caucasian employees any differently; (4) plaintiff does not rebut defendant's legitimate nondiscriminatory, nonretaliatory reason for his termination, i.e. that repeated workmanship errors caused equipment damage and product loss; (5) a jury could not find that race or retaliatory motive caused defendant to terminate plaintiff's employment because the individuals who decided to terminate plaintiff's employment did not know plaintiff's race or that he had engaged in protected opposition to discrimination.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252. The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which [he] carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). And, while the Court views the record in a light most favorable to the party opposing summary judgment, the nonmoving party may not rest on his pleadings but must set forth specific facts. Id. The nonmoving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). If the nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted. Liberty Lobby, 477 U.S. at 250-51.

**Facts**

The following facts are uncontroverted or, where controverted, construed in a light most favorable to plaintiff.[1]

Plaintiff is African-American. Defendant owns and operates a tire plant in Topeka, Kansas. In November of 2006, during a strike, defendant hired plaintiff as a temporary employee to paint, clean and mop. On January 29, 2007, after the strike ended, defendant hired plaintiff to work as a tire layer in the Earthmover Department. Tire layers cure "green tires" in presses. Their duties include inspecting the presses, inserting tires into the presses, cooking the tires and removing the tires from the presses. Defendant assigns tire layers to particular presses and ultimately assigned plaintiff to the F Line, where he was the only African-American. While he worked as a tire layer, plaintiff had three supervisors: Dena Bullard, Jim Keefe and Chris Prescott. At some point, due to his seniority, plaintiff became a trucker in the Earthmover Department. Plaintiff worked in that department until defendant fired him on March 12, 2008. As a trucker, plaintiff still could lay tires.

Defendant gives employees a Zero Tolerance Policy Manual which includes an anti-discrimination policy that prohibits racial discrimination and harassment and retaliation against employees who make complaints of discrimination. Defendant also conducts periodic plant-wide

---

[1]    Plaintiff has complied to some degree with D. Kan. Rule 56.1, the local rule which governs summary judgment and requires a party opposing a motion for summary judgment to begin the opposition with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists, separately numbering by paragraph each fact in dispute, referring with particularity to the portions of the record upon which the opposing parties rely, and (if applicable) stating the number of movants' fact that is disputed. D. Kan. Rule 56.1(b). Similarly, defendant has complied to some degree with D. Kan. Rule 56.1(c). Further, the parties have at times improperly attempted to state facts which have no basis in the record or to controvert facts with conclusory legal arguments, which the Court disregards. Ferluga v. Eickhoff, No. 05-2338-JWL, 2006 WL 3144218 at *2 (D. Kan. Oct. 31, 2006). The Court does not consider facts which appear in the parties' argument but not in the parties' statements of facts. See e.g., Freeman v. Spencer Gifts, Inc., 333 F. Supp.2d 1114, 1118 n. 1 (D. Kan. 2004); D. Kan. Rule 56.1.

training about its zero tolerance policies. The Manual contains a formal zero tolerance policy for racial and sexual discrimination, and prohibits racial harassment. It also details the procedure for reporting alleged harassment. The policy states as follows:

> The Goodyear Tire & Rubber Company is committed to maintaining a workplace free of harassment based on a person's protected status such as sex, race, age, religion, disability, ancestry, or national origin. The conduct described herein may not in every case be illegal, but is against our policy. The company will investigate and take appropriate action on any reports of such conduct.
>
> As a Goodyear associate, you should not bother or harass any person, member, associate, or customer. All Associates should be respectful of each other's rights, opinions and beliefs. If you are a victim of improper discrimination or harassment, or observe such conduct whether by another associate or manager, a vendor, or customer, please report it.
>
> * * * * *
> The Company will not tolerate conduct harassment based on a person's sex, race, age, religion, disability, ancestry or national origin. Examples of such conduct include offensive epithets, slang terms, and jokes about these characteristics.

At the Topeka plant, defendant also displays a Zero Tolerance Poster which states as follows:

> **Zero Tolerance**
>
> Goodyear is committed to providing a work environment that is professional, respectful, and free from discrimination, harassment, or violence. Zero Tolerance refers to a standard of conduct. The forms of discrimination, harassment, or violence described in this booklet are not acceptable conduct at Goodyear. Goodyear has zero tolerance for them and will take action on all reports. No incident will be ignored. Zero Tolerance is not a system of penalties and does not mean that every violation will necessarily result in termination, although certain violations may result in immediate discharge. The responsibility is on management to ensure that penalties (e.g., discipline, corrective actions, etc.) are not imposed arbitrarily, but are consistent, proportionate, and lawful. These policies apply to the workplace as well as other settings in which associates may find themselves in connection with their employment. While these policies refer primarily to associates, where appropriate, these policies also apply to non-associates, including applicants, contract or temporary workers, guests, customers, vendors, and consultants.
>
> **Discrimination**

Goodyear shall recruit, hire, train, compensate, promote, and provide other conditions of employment without regard to an individual's race, color, religion, national origin, sex (including pregnancy), sexual orientation, age, disability, veteran status, or other characteristics protected by applicable law. Goodyear will use merit, qualifications (for example, education, experience, competencies, etc.) and other job-related criteria as the sole bases for all employment-related decisions affecting associates and applicants. Any form of illegal employment discrimination is prohibited under this policy . . .

## Harassment

Goodyear prohibits harassment, or singling individuals/groups out for abuse or ridicule, based on race, color, religion, national origin, sex (including pregnancy), sexual orientation, age, disability, veteran status, or other characteristics protected by applicable law. Inappropriate behavior or material includes offensive name-calling, slurs, taunting, epithets, graffiti, jokes, posters, calendars, e-mails, internet sites, or other things deemed inappropriate by the Company. It includes conduct that is unwelcome and unwanted, and has the purpose or effect of creating an intimidating, hostile, or offensive working environment . . .

## Reporting a Concern

Everyone is responsible for assisting the Company in maintaining a work environment free from discrimination, harassment, and violence. It is everyone's responsibility to promptly report any concerns or incidents to which he/she is subject, that he/she witnesses, or to which he/she becomes aware. Reports can be made to any one of the following resources:
- Your supervisor plant manager/department head, or human resources representative.
- Goodyear's Director of Corporate Compliance & Ethics at 330-796-7288 (GTN 446-7288).
- The Law Department at 330-796-1100 (GTN 446-1100).
- "The Network" (see Section 9 below). Reports can also be made anonymously through "The Network."

## Company Response

Reports of potential zero tolerance violations or concerns will be promptly and fairly investigated. The Company will maintain confidentiality during the investigation to the maximum extent possible under the circumstances. While each investigation will vary depending on the circumstances, interviews will typically be conducted with the person making the report, the individuals involved, and potential witnesses . . .

Where a violation has been substantiated, the Company will act to promptly

eliminate the conduct and impose appropriate corrective action. Depending on the circumstances, the Company may take disciplinary action, ranging from verbal counseling to immediate termination of employment where warranted. Other corrective actions may include a negative notation on a performance evaluation, loss of pay, job transfer, counseling or training, or any other penalty or action the Company deems appropriate.

At any time, toll-free, employees can call "The Network" – an independent telephone answering service – to anonymously report potential policy violations or concerns. Employees can also report violations or concerns to their supervisors, plant manager/department heads or human resources representatives. Plaintiff knew about defendant's zero tolerance policy and knew that defendant had a hot line to make complaints about workplace issues.

Defendant maintains a progressive discipline policy entitled "Positive Discipline System" which includes five steps. Under the policy, the area manager has discretion whether to move the employee to the next step. The policy states as follows:

Step #1: The area manager will talk to the associate on the job on a confidential and positive basis . . .

Step #2: Should another incident arise which requires some followup action, the area manager will again address the incident casually on the job, but will later call the associate into his office for a more serious and formal discussion. In addition, the incident will be discussed with the associate's union's representative.

This contract language needs some explanation. A repeat incident should not mean that the second step is automatically implemented. If, in the opinion of the area manager, enough time has elapsed between incidents, or if the circumstances of the incident can be discovered during a casual "on the job" discussion, then the area manager may elect not to proceed to proceed with Step #2. If Step #2 is necessary, the area manager should contact the union representative following the "on the job" discussion, set up a time for the formal discussion and then hold the discussion with the union representative and associate if the associate desires representation.

Step 3: In the event of a repeat infraction, the procedures from Step #2 should be repeated with some additions. The area manager, with the union representative present. should express concern over the incident and express his hope that the associate will decide to recognize and change his/her behavior. This discussion

should be confirmed in writing and signed by the business center manager, and a copy should be given to: the associate, the union representative, and the union president. One year should elapse without a similar incident before this step is cleared from the record.

Step #3 should be handled in the same fashion as Step #1 and Step #2; on a personal basis with the circumstances of the case reviewed against at this step. The difference at this step is that the area manager will write a letter addressing the incident and documenting that the meeting did take place. The business center manager will then sign this letter and it will be forwarded to the appropriate people. It should be understood that this letter is written only if the area manager feels that Step #3 should be implemented. After discussion with the associate it is possible to either place the associate in Step #3 or not, depending upon the circumstances of the case.

Step #4: An associate who refuses to change his/her behavior, resulting in a repeat incident will once again be called to the office, with his union representative if they so desire one. The area manager should advise the associate that he will be given a day off with pay so that he can consider whether or not he can function within the established standards of the work place. The associate will be asked to provide a letter of commitment indicating whether or not he/she recognizes the problem with his behavior and whether or not he/she has chosen to correct his/her behavior.

At this point the associate will be instructed to stay home the next day (or, if the problem is absenteeism, the balance of the shift that day) to consider his/her behavior and how it relates to his/her job. They should be informed that they will be paid for this day and asked to write the above mentioned letter. This letter should be a means for the associate to express his feeling towards his/her job, what he/she perceives as the reason for his/her behavior and what he/she intends to do about it. The associate may recognize his/her behavior is a problem, realize the importance of his/her job and commit to changing their behavior. They may wish to use the letter as a means of expressing discontent with their job and list those reasons. We must understand that some people cannot or will not express themselves verbally, but with time at home, may able to clarify and give reasons for their behavior that they cannot talk about it in a "face to face" encounter.

The letter is optional but should be encouraged as a way for the associate to express their feelings and explain their behavior when they can calmly and without pressure, stop and think about their actions and their effects on him/her, their family, and the company . . .

Step #5: Should another incident occur, the employee is placed on a 2 day cooling off period (two full working days) while consideration is being given as to whether his/her employment will be terminated. Once an employee is placed on a 2 day cooling off period, the union can request a meeting of the "positive discipline review

board" to present their views on the case. Any discussion to terminate an individual's employment will be confirmed in writing, signed by the department manager and sent to the employee with copies to the union representative and union president.

Defendant trains its managers on the Zero Tolerance Policy and how to respond to complaints of racial harassment. Tony McCauley, defendant's former Human Resources Services Director, encouraged managers to document complaints and to speak to him about them. Defendant does not have a policy, however, which mandates that they do so.

After defendant hired plaintiff, he trained for two to three months under Burt Palmer, Alan Copeland and Greg Alfano, the experienced employees on the first shift. Two other employees (both Caucasian) trained at the same time: Don Riffey and Joe Patterson. Riffey had worked with plaintiff as a temporary employee during the strike, and defendant hired both Riffey and plaintiff as tire layers at about the same time. It hired Patterson to do mold and bladder work. Plaintiff referred to Riffey and Patterson as "kids" because they were much younger than he is. From the time they were hired, Riffey was clear that he wanted to "outdo" plaintiff as a tire layer.

When he began working as a tire layer, plaintiff understood that because he had worked during the strike, there would be "issues." In fact, during training, someone placed papers which said "scab" in the lockers of plaintiff, Riffey and Patterson.[2] After several weeks, Riffey and Patterson stopped receiving the papers, but plaintiff received them throughout his employment. On one occasion, Alfano "flipped off" plaintiff because plaintiff had annoyed him during a training session.

After they completed training, defendant assigned plaintiff, Riffey and Patterson to the

---

[2]        "Scab" is a pejorative term for someone who works during a work stoppage.

second shift.  Plaintiff became the shift lead hand because on his shift he technically had seniority.  The lead hand prepares work schedules and keeps track of hours worked and eligibility for overtime, which is not an easy task, and earns $2.00 extra per hour.  Mike Jones and Area Specialist Antonio Carcomo were supposed to give plaintiff "extra attention" because he was relatively inexperienced for a lead hand.  Jones, who was in charge of lead hand positions, gave plaintiff one or two hours of training.  Alfano, who was lead hand on first shift, did not explain things well and provided plaintiff minimal training.  Some employees trained Riffey to perform the lead hand duties and refused to train plaintiff.  When plaintiff needed help, though, experienced employees would assist him.

During the strike, Riffey was "pretty big at kissin' butt" with his manager.  This conduct continued after the strike when the manager became a department head.  Riffey wanted a lead hand position for himself and due to his "obsession with outdoing plaintiff at all costs," Riffey tried to get plaintiff removed from his lead hand position.  Specifically, Riffey complained to Jones that plaintiff did not know how to build an overtime schedule – which plaintiff had not been trained to do.  Jones suggested to plaintiff that he quit the lead hand job.  Plaintiff did not do so.  At some point, however, Riffey, Patterson and Dustin Hoefstadler (a young Caucasian who also had been hired as a tire layer) voted plaintiff out and Riffey became lead hand.  Plaintiff complained to Jones, but Jones encouraged plaintiff to give up the lead hand position to Riffey.

Racial comments were numerous but plaintiff was "oblivious."  He did not report them because he was a new employee and a scab and he did not want to "stir the pot."  He "blew off" a "lot of the racial things" because if he paid attention to all of them he would "go crazy."  He therefore let people do and say what they wanted.  Once while walking by the break room, in

connection to a flyer that had stick people on it, plaintiff heard Copeland make a comment about black people. The flyer was a piece of paper with black stick figures drawn on it. Plaintiff thought Copeland might have been telling a joke, and "blew it off." Plaintiff did not report Copeland's comment because he was a new employee and a scab. Another time while walking by the break room plaintiff heard Keefe (who was no longer plaintiff's supervisor) say "spearchucker" while he was there with some night shift employees. Plaintiff did not hear any other part of Keefe's conversation and does not know the context of the comment, and Keefe never made any racial comments to him. Plaintiff did not report Keefe's comment. He thinks that he heard someone say "nigger" as he walked by the break room but does not know who. He heard the word "nigger" quite a few times, but he does not know who said it. Plaintiff "blew off" those comments. According to plaintiff, he was "immune" to such comments and kept working. Plaintiff could recall no specific racial comments or jokes by Alfano or Palmer.

Racial graffiti, including the words "nigger" and "nigger scab," was on the bathroom walls. Plaintiff reported the graffiti to Robert Tripp, the union president, but not to defendant's management. Plaintiff saw a safari magazine with a monkey on the cover and the words "JR scab" written on it. Plaintiff did not report the magazine. Plaintiff never made any complaints to defendant's hot line.

Locker-gluing occurred throughout defendant's plant and most – if not every – employee locker was glued shut at one time or another.[3] Employees from all shifts complained about lockers being glued shut. Plaintiff's locker was glued shut twice. Plaintiff does not know who glued it shut

---

[3] "Locker-gluing" occurs when someone puts super glue inside the keyhole of the lock on the locker. The glue hardens and keeps the key from fitting into the keyhole.

and no one told him it was because of his race. He attributed it to racism, however, because "you know racism when you feel it." At some point plaintiff complained to Jay Greathouse, who preceded McCauley, that someone had glued his locker. Greathouse did not take plaintiff's statement and did not document whether he investigated plaintiff's complaint.

Once, after taking a shower, Copeland approached plaintiff in the break room and placed one of his feet a few inches from plaintiff's face. When plaintiff objected, Copeland laughed and removed his foot. Plaintiff thought the conduct was inappropriate and reported it to Bullard.[4] Plaintiff does not know what, if anything, Bullard did about his complaint. Plaintiff continued to train under Copeland. Plaintiff had no further problems with Copeland and Copeland never put his foot in plaintiff's face again.

Plaintiff alleges that Keefe wrote him up for incidents which were not his fault and did bizarre things like trying to scare him with a mouse.

Beginning in March of 2007, Riffey and other employees hid plaintiff's tools. Therefore he sometimes ran late. Riffey hid plaintiff's tools because he "always wanted to outdo" plaintiff. In approximately April of 2007, plaintiff reported Riffey's conduct to Bullard, who then counseled Riffey.[5] Despite this counseling, which plaintiff viewed as a "slap on the hand," Riffey continued to hide plaintiff's tools. Plaintiff thought that this conduct was juvenile and considered Riffey a kid who liked to play. Plaintiff testified, "He's a kid playing. I ain't got time to play. That's him and his job." Plaintiff kept extra materials in his locker to combat the problem.

---

[4]     The record does not reveal why plaintiff felt this act was inappropriate.

[5]     Bullard was not required to and did not document the counseling on Riffey's attendance card or ask plaintiff to provide a written statement.

On May 31, 2007, Keefe counseled plaintiff for workmanship when he laid a tire after a bladder buckled. Keefe cautioned plaintiff to inspect cured tires for defects to avoid laying another tire with the same resulting defect. Plaintiff acknowledged the incident but after discussing it with Palmer and Copeland, he believed that the press had malfunctioned and that he was not at fault. Copeland told him that a press malfunction had caused the buckle. Plaintiff "blew off" the incident because it did not result in a step discipline. Plaintiff believes that around the same time, the same press malfunction caused a buckled bladder on one of Riffey's tires, but that Keefe did not counsel Riffey.

On June 16, 2007, Keefe and Prescott counseled plaintiff for workmanship because of a pinched bead. They documented the counseling on plaintiff's attendance card, but later crossed it out with a note that the bead kinked in four places from too much pressure, suggesting that it was a press malfunction.

On August 21, 2007, Prescott held a meeting with the second shift employees after plaintiff complained about a dispute with Riffey the night before. Plaintiff had held his hand on a truck seat to keep the automatic engine-shut-off from activating when he stood up, and Riffey sat down quickly on the seat. This would have injured plaintiff's fingers if he had not jerked them away. Plaintiff also complained that a week before, Patterson had called him a "black cracker." Riffey had heard the comment and told plaintiff about it, saying that Patterson should have called plaintiff a "white nigger" instead.[6] Plaintiff, who thinks he was still lead hand at the time, also complained that Riffey

---

[6]     Prescott was not required to and did not ask plaintiff or any other employee to provide a written statement about what was discussed during the meeting.

-13-

was still hiding his spray cans and tools.[7]

At the meeting on August 21, 2007, Prescott reminded employees about defendant's zero tolerance policy and the strict policy against harassment. Prescott believed that everyone on second shift was making jokes and comments because second shift employees were always laughing and joking around. After the meeting Prescott wrote a memo which includes two comments – "black

---

[7]     To his opposition to defendant's motion for summary judgment, plaintiff attaches a declaration. Defendant suggests that plaintiff is attempting to create "sham fact issues" and argues that the declaration should be stricken. Defendant also argues that the declaration contains testimony which is not based upon personal knowledge, and that plaintiff attempts to controvert facts by merely attacking the credibility of testimony without providing substantive evidence.

The Court has carefully examined plaintiff's deposition testimony and declaration and disagrees with defendant's argument that plaintiff's entire declaration conflicts with his deposition testimony. For the most part, the declaration clarifies and supplements plaintiff's deposition testimony, which is consistent with Tenth Circuit authority which allows affiants to clarify prior testimony that reflects confusion. See Law Co., Inc. v Mohawk Const. and Supply Co., Inc., 577 F.3d 1164, 1169 (10th Cir. 2009) (court may not disregard affidavit solely because it conflicts with prior sworn statements; if court finds conflict it should disregard affidavit which attempts to create sham fact issue after considering whether (1) affiant was cross-examined during earlier testimony; (2) affiant had access to pertinent evidence at time of earlier testimony or whether affidavit based on newly discovered evidence and (3) earlier testimony reflects confusion which affidavit attempts to explain). In fact, it is defendant who miscites or misconstrues deposition testimony. For example, defendant insists that plaintiff testified in his deposition that racial language did not precede the meeting on August 21, 2007. Plaintiff clearly testified, however, that at some point he and Prescott discussed Patterson's use of racial language; whether this discussion occurred before or during the meeting is ambiguous, and the declaration merely supplements and clarifies plaintiff's deposition testimony. See Deposition of Jesse R. Spencer at 77:8-15, Ex. A, Doc. #36-1, p. 21.

Defendant also argues that plaintiff has changed his testimony about whether certain pc cards (which contain identifying information for tires, see fn. 9, supra.) were his. Plaintiff's declaration and deposition testimony regarding pc cards are consistent, however. During his deposition, plaintiff examined pc cards which he previously acknowledged were his and developed a belief that the cards had been forged. He now believes that the cards were not his. Defendant also complains that plaintiff has no personal knowledge whether in May of 2007, Riffey was counseled when plaintiff was not. Plaintiff is competent, however, to testify that to his knowledge, he was counseled about a buckled bladder when Riffey was not. Finally, to the extent plaintiff includes legal conclusions in his declaration, the Court disregards them.

cracker" and "when are you going to your Klan meeting." The memo does not identify who said either comment. Plaintiff does not recall what was discussed at the meeting or whether either he or Riffey made any racial comments during the meeting. McCauley does not recall Prescott discussing the meeting or related incidents with him and believes he would have investigated if he had known about them. Plaintiff's co-workers continued to harass him after the meeting, and plaintiff complained to Prescott and Human Resources about the harassment.[8]

On September 11, 2007, Patterson complained to Prescott that plaintiff had called Patterson gay. Plaintiff denied calling Patterson gay but admitted making such an implication when he, Patterson and Hoefstadler were horsing around calling each other names. Prescott thought that the horseplay was an extension of the joking which had occasioned the meeting on August 21, 2007. He counseled plaintiff about defendant's zero tolerance policy against harassment, but he did not counsel Patterson or Hoefstadler for the joking around. Moreover, except for the meeting on August 21, 2007, Prescott never counseled Patterson or Riffey for the racial comments about which plaintiff complained.

On September 17, 2007, Prescott placed plaintiff on Step 1 after he laid a tire off center, which resulted in a bent center post. Plaintiff contended that a press had malfunctioned, but Prescott concluded that operator error had caused the damage. Plaintiff accepted the step discipline even though he did not think that the damage was his fault and told Prescott so. Plaintiff admitted, however, that he did not know whether the post had to be manually lowered before the dome closed. Prescott told plaintiff that he had discussed the incident with Keefe and that the step would be

---

[8]     Plaintiff testified that he complained "all the time" about the harassment but he could not identify specific occasions when he complained.

removed if he did not have another problem for three months. Until Prescott placed plaintiff on Step 1, the two had been "buddies."

On October 22, 2007, Prescott placed plaintiff on Step 2 for laying four tires with buckled bladders on October 20, 2007. According to a scrap report on October 22, the tires were scrapped.[9] Plaintiff's employee number was written on the four pc cards which were attached to the scrap report. At the time, plaintiff thought that the pc cards were his but that they had been switched into tires that were not his. He told Prescott that the tires were not his and that someone had changed the pc cards. Plaintiff now believes that the cards were not his and that his employee number was forged on the cards. After he received the Step 2, plaintiff told someone in Human Resources that someone had switched his tires. He was instructed to write his initials on his assigned tires, which he did.

A second scrap report dated November 5, 2007 mimics the report of October 22, 2007. It indicates that the prior weekend, someone discovered four tires with buckled bladders hidden behind a heater. The pc cards in the tires had plaintiff's employee number and indicated that the tires were cured in press F-5 – three on October 20 during first shift and one on October 19 during second shift. Plaintiff denied that the tires were his because on the pc cards, his work number was crossed out and the date was written with the month, date and year while his practice was to write the month, date and shift. The pc cards from the scrap reports on October 22 and November 5 indicate that on

---

[9] A pc card accompanies most tires and contains identifying information such as the number of the employee who laid the tire, the date, the month and the shift the tire was laid. A green tire generally came with a pc card on which plaintiff would write his employee number and the month, date and shift. After completing his task with a tire and writing on the card, plaintiff would place the pc card inside the tire, and that was the last time he would see it.

October 19 and 20, eight tires which had buckled bladders were laid on the same press.[10] Apparently, no one knows who put the four tires behind the heater or why it took so long to discover them. Plaintiff, however, was working during the shifts when the tires were laid. According to payroll records, he worked eight hours on second shift on October 19 and 5.6 hours on first shift on October 20.

On November 13, 2007, one of plaintiff's tires pinched in the mold and Carcamo counseled him. Plaintiff acknowledged the counseling.

On December 5, 2007 plaintiff complained to McCauley about harassment. McCauley took detailed notes of the incidents which formed the basis of plaintiff's complaint. They included the following: (a) plaintiff had been treated as a "black sheep" or scab; (b) plaintiff was the previous lead hand, but he did not receive adequate training; (c) plaintiff's co-workers did not think he could handle the lead hand job; (d) plaintiff's pc cards had been changed on four scrap tires; (e) plaintiff had been harassed by an area manager who counseled him for a press malfunction; (f) plaintiff's locker had been glued; and (g) Riffey and Patterson (who were white) had filed harassment charges against plaintiff. McCauley and plaintiff discussed ways to begin gathering information and agreed to stay in touch if further incidents occurred. Plaintiff was not the only employee who was being harassed at that time, and McCauley perceived that plaintiff was being harassed because he had

---

[10]    The record reveals a genuine issue of material fact why defendant placed plaintiff on Step 2. Plaintiff contends that Goodyear used the November 5 report to bolster its decision to place him on Step 2 because defendant stated in its position statement to the Kansas Human Rights Commission that the November 5 scrap report resulted in it placing plaintiff on Step 2. Similarly, Prescott testified initially that the November 5 scrap report caused him to place plaintiff in Step 2. Prescott later revised his testimony to indicate that the October 22 scrap report caused the step and that he did not discipline plaintiff for the November 5 report. Goodyear now argues that the position statement mistakenly cited the November 5 report instead of the October 22 report, and that Prescott mistakenly testified about the November 5 report.

crossed the picket lines to work. He understood that plaintiff was alleging racial harassment, but he did not believe that he had evidence of a racial motive or a specific racial statement.

On December 6, 2007, McCauley pursued his investigation of plaintiff's harassment complaint by discussing it with Scott Baer, who managed the supervisors. According to McCauley's notes, he and Baer agreed to the following action plan:

> 4-A. Discussed with Scott to have Chris [Prescott] check with Spencer nightly for problems. If locker glued or something missing, need to do a locker search. Next step, administer discipline for anything incriminating. B. If necessary, will discuss additional measures with union after that. So 4-A and B is an action plan that Mr. Baer and I agreed to do through the supervisors, basically to tune them up to be more responsive to anything that they learned about that was harassment related to the replacement worker situation.

McCauley and Prescott never talked about the complaint.

On December 10, 2007 Prescott placed plaintiff on Step 3 for laying four tires with a loose panel on December 7, 2007. The tires did not have pc cards because they were military tires. Plaintiff's initials – "JRS" – were written in white on the thread of the tires. Photographs of the tires with plaintiff's initials were attached to the scrap report. Five tires appear in the report. Plaintiff was not stepped for the first tire but he was stepped for duplicating the error in four additional tires. Plaintiff met with Carcamo, Prescott and union representative Mike Keller and denied that the tires were his. Plaintiff stated that someone else had written his initials on them. Carcamo and Prescott responded that they believed the tires were plaintiff's because they had come off of his press, and Keller agreed. Prescott also determined that the tires belonged to plaintiff because his initials appeared on the tire cure charts. On December 11, 2007, Goodyear issued a letter which confirmed plaintiff's Step 3 discipline.

On December 18, 2007, plaintiff told McCauley that he knew someone who could identify

the person who had anonymously harassed him. According to McCauley's notes, plaintiff said that Clyde Bassinger (a third shift employee) had "darn near admitted to changing [the] paperwork on his workmanship issues." The basis for plaintiff's belief was that Bassinger had allegedly told Hoefstadler that plaintiff was the only person who Bassinger "messes with."

On January 7, 2008, Area Manager Scott Downing placed plaintiff on Step 4 for walking away from a press before the dome closed, causing the tire and bladder to blow. Plaintiff accepted responsibility but argued that he should have been placed in Step 1, not Step 4.[11] Plaintiff did not receive an opportunity to write a letter to express his feelings about his job, which is contrary to defendant's progressive discipline policy. The record does not reflect why plaintiff did not receive this opportunity.

On January 8, 2008, McCauley interviewed Hoefstadler, who did not confirm plaintiff's suspicions about Bassinger. Scabs were frequently harassed in several areas of the plant and McCauley could not determine who was doing it. He therefore met with union leaders and threatened to take aggressive action unless the harassment stopped. After the union relayed that message to the workers, the plant-wide harassment "settled down" and plaintiff did not complain to McCauley about harassment again. Plaintiff complained to Human Resources four or five times about incidents (including the tires) which impacted his work performance, but he let the "racial BS ride."

In early January of 2008, Keefe questioned plaintiff about a sexual harassment claim concerning plaintiff and a female co-employee. On January 14, 2008, Keefe entered the following

---

[11]     Plaintiff argued that Steps 2 and 3 were without cause and therefore should not have been counted on his record, and that the Step 1 from September 17, 2007 would already have been removed because more than three months had elapsed since plaintiff received it.

notation on plaintiff's attendance card: "Talked to Jessie about his conduct with a female associate and that other associates found it to be offensive to them and it needed to stop. I told Jessie if it happened again he would be subject to Step III for harassment." Plaintiff denied any wrongdoing. McCauley investigated and concluded that the complaint involved "a kernel of truth that had gotten blown out of proportion as a rumor" and determined that while the allegation was not false, no harassment had occurred. In February of 2008, McCauley directed Baer to remove any notation about the incident from plaintiff's file. Baer did so on April 10, 2008. No other supervisor mentioned or alluded to the sexual harassment allegation, but plaintiff claims that his image suffered.

On March 3, 2008, Prescott, Carcamo and Baer placed plaintiff on Step 5 for laying a tire with a rind in the press which ruined the tire. Plaintiff admitted the tire was his but suggested that he should be excused because he had laid the tire near the end of his shift, he was alone and he was rushing to prepare for the next shift. Also, he could not see because it was Sunday and the lights had been reduced. Prescott, Carcamo, Baer, union representative Joe Flippo and plaintiff attended the Step 5 meeting. At the meeting plaintiff learned that he was fired, contrary to defendant's progressive discipline policy. He did not receive a two day cool-down period.[12]

For Step 5 discipline, a review board reviews the logic that management has used in reaching a decision. The review board does not conduct an independent investigation of the facts, does not interview the employee and does not permit the employee to attend the review board meeting. A

---

[12] Defendant's progressive discipline policy states that if an incident occurs which would move an employee to Step 5, the employee is placed on a two-day cooling off period while defendant considers whether to terminate his employment. Once an employee is placed on a two-day cooling off period, the union can request a meeting of the "positive discipline review board" to present their views on the case. Any discussion to terminate an individual's employment will be confirmed in writing, signed by the department manager and sent to the employee with copies to the union representative and union president.

union representative attends on behalf of the employee. The review board which reviewed plaintiff's Step 5 consisted of three managers – Tim Druftz, Larry Jamison and Eric Reckenbeil – who did not know plaintiff or his race, who had no involvement with plaintiff's employment and who did not know that plaintiff had complained of racial harassment. The review board unanimously voted to terminate plaintiff's employment because of the recorded workmanship errors that had moved him through the five-step positive discipline process. On March 12, 2008, defendant fired plaintiff.

After the termination, plaintiff met union chairman A.J. Stattelman. They decided to file a grievance. On April 28, 2008, after a grievance hearing, McCauley denied plaintiff's grievance.

## Analysis

Plaintiff alleges disparate treatment in violation of Title VII and 42 U.S.C. § 1981 (Count I), hostile work environment harassment in violation of Title VII and 42 U.S.C. § 1981 (Count II) and retaliation in violation of the Fourteenth Amendment and 42 U.S.C. § 1981 (Count III). Defendants assert that they are entitled to summary judgment on each of plaintiff's claims.

### A.      Disparate Treatment (Count I)

Plaintiff claims that defendant violated Title VII and 42 U.S.C. § 1981 when, because of race, defendant took two adverse actions against him: (1) failing to provide the same training as white co-workers, which made it harder for him to do his job; and (2) disciplining, counseling and ultimately terminating him for harassment and work performance when white co-workers were not similarly treated.[13] Defendant seeks summary judgment on this claim, arguing that plaintiff fails to establish

---

[13]      42 U.S.C. § 2000e-2(k) of Title VII states in relevant part as follows: "[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

(continued...)

a prima facie case because (1) failing to train and counseling and disciplining are not actionable adverse employment actions; (2) plaintiff committed serious work errors and therefore cannot demonstrate that he performed his job satisfactorily; and (3) plaintiff presented no evidence that other employees who were similarly deficient received more favorable treatment. Defendant also advances a legitimate reason for disciplining and firing plaintiff and argues that plaintiff has presented no evidence of pretext.

Title VII prohibits intentional employment discrimination on the basis of race, which is known as "disparate treatment." See Ricci v. DeStefano, 129 S.Ct. 2658, 2672 (U.S. 2009). Disparate treatment occurs when an employer treats a particular person less favorably than others because of a protected trait. Id. To prove disparate treatment, plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action. Id. The precise articulation of a prima facie case depends on the context of the claim and the nature of the adverse employment action alleged. Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005). For both claims, plaintiff may make a prima facie case by showing that (1) he belongs to a protected class, (2) he suffered an adverse employment action and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination. Freeman, 333 F. Supp.2d at 1129;

---

[13](...continued)

In a case under Title VII and § 1981 arising out of the same facts, the commonality of factual issues between the § 1981 and Title VII claims is nearly all-encompassing: the elements of each cause of action are construed identically and a jury verdict on the issue of liability under § 1981 is normally conclusive on the issue of liability in a parallel action under Title VII. Therefore, Title VII and § 1981 claims are analyzed the same way. Thomas v. Denny's, Inc., 111 F.3d 1506, 1513 (10th Cir. 1997).

Plotke, 405 F.3d at 1099-1100.[14]  As to plaintiff's counseling, discipline, and termination claim,

plaintiff must also demonstrate that he was doing satisfactory work, which is a light burden.  Plotke,

405 F.3d at 1099-1100.  To prove the final prong (that the adverse employment action occurred

under circumstances which give rise to an inference of discrimination), plaintiff must establish

through direct or indirect evidence that defendant had a discriminatory intent or motive.  Orr, 417

F.3d at 1149-50.

In this case, plaintiff seeks relief under a "mixed-motive" theory.  A "mixed-motive" theory

typically appears as an affirmative defense when plaintiff offers evidence that defendant had

---

[14]    In Kendrick v. Penske, 220 F.3d 1220, 1229 (10th Cir. 2000), the Tenth Circuit found that this Court erred by requiring plaintiff to show at the prima facie stage that defendant treated him differently than similarly-situated non-minority employees.  It articulated a four-prong test for prima facie discrimination:  (1) membership in protected class; (2) qualification for job; (3) termination despite qualification and (4) job not eliminated after termination.  Id.  In 2005, the Tenth Circuit in Plotke broadened the fourth prong to permit plaintiffs to show discriminatory intent through other means.  405 F.3d at 1099-1100.  Shortly after Plotke, another Tenth Circuit panel decided Orr v. City of Albuquerque, 417 F.3d 1144, 1149-50 (10th Cir. 2005), using the three-prong test rejected in Kendrick.  Since that time, the Tenth Circuit has articulated a variety of standards for establishing a prima facie case of disparate treatment.  See, e.g., Robinson v. Cavalry Portfolio Servs., LLC, Nos. 08-5010, 08-5022, 2010 WL 447000, slip op. at *9 (10th Cir. Feb. 10, 2010) (in disparate treatment termination case plaintiff must show that (1) she is a member of a racial minority, (2) she suffered adverse employment action and (3) similarly situated employees were treated differently); Semsroth v. City of Wichita, 304 Fed. Appx. 707, 718 (10th Cir. 2008) (same); Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008) (same); Barone v. United Airlines, Inc., No. 08-1348, 2009 WL 4547800, slip op at *9 (10th Cir. Dec. 7, 2009) (for prima facie case of disparate treatment in termination case, plaintiff must show that (1) she belongs to protected class; (2) she suffered adverse employment action; and (3) the challenged action occurred under circumstances giving rise to inference of discrimination);  E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007) (same); Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005) (same); Strickland v. United Parcel Serv., Inc., 555 F.3d 1224, 1230 (10th Cir. 2009) (to prove disparate treatment claim, plaintiff must show adverse employment action because of her sex); Allen v. Sulzer Chemtech USA, Inc., 289 Fed. Appx. 278, 282 (10th Cir. 2008) (plaintiff makes prima facie case of prohibited employment action by showing that she (1) belongs to a protected class; (2) was qualified for her position; (3) was terminated despite those qualifications; and (4) was terminated under circumstances that give rise to an inference of discrimination).

impermissible motives when making an adverse employment decision. <u>McNulty v. Sandoval County</u>, 222 Fed. Appx. 770, 774 (10th Cir. 2007) (quoting <u>Thomas</u>, 111 F.3d at 1512). It allows defendant to argue that it had both permissible and impermissible reasons for making an adverse employment decision, and that it would have made the same decision absent the impermissible motive. <u>Id.</u> While the mixed-motive theory seems best used by defendants as a shield rather than by plaintiffs as a sword, increasingly plaintiffs affirmatively invoke the mixed motive theory. <u>See</u>, <u>e.g.</u>, <u>Thomas</u>, 111 F.3d at 1511-12 (noting that courts should employ mixed motive analysis wherever appropriate, not just when invoked by defendant). To do so, they must at some point make an affirmative election between mixed-motive and pretext theories by persuading the factfinder either that the evidence shows discrimination was a "motivating factor," in which case the evidence is analyzed under the mixed-motive theory, or that the employer's reason is unworthy of belief, in which case the pretext framework applies. <u>Fye v. Okla. Corp. Comm'n</u>, 516 F.3d 1217, 1225 (10th Cir. 2008).[15] In this case, however, the mixed-motive invocation appears to be an unnecessary complication and the Court does not address it further. For purposes of this motion, the over-arching question is whether plaintiff has demonstrated a genuine issue of material fact whether discrimination played any role in defendant's decisions.

If plaintiff offers no direct evidence that discrimination motivated the defendant's action, the Court assesses circumstantial evidence by applying the analytical "pretext" framework pioneered in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Id.</u> Under <u>McDonnell Douglas</u>, a plaintiff alleging a Title VII or Section 1981 violation has the initial burden to make a prima facie

---

[15]     In <u>Fye</u>, The Tenth Circuit notes that at some point plaintiffs must elect between mixed-motive and pretext theories. It then analyzes the evidence under both frameworks because plaintiff argued that the evidence directly reflected both unlawful motive and pretext. <u>Id.</u> at 1226.

showing of race discrimination.  Kendrick, 220 F.3d at 1225-26 (McDonnell Douglas applies equally to claims under Title VII and Section 1981).  The burden of establishing a prima facie case is not onerous, and plaintiff satisfies it by presenting a scenario that on its face suggests that defendant more likely than not discriminated against him.  Id. at 1226.  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the questioned action.  Id.  Defendant's burden is of production, not persuasion.  Glover v. NMC Homecare, Inc., 106 F. Supp.2d 1151, 1165 (D. Kan. 2000).  If defendant meets this burden, plaintiff must show that defendant's stated reason is a pretext for prohibited discrimination.  See id.

The Court addresses in turn both of plaintiff's claims of discrimination.

1.    Failure To Train

As noted, to state a prima facie case, plaintiff must show that (1) he belongs to a protected class, (2) he suffered an adverse employment action by his employer and (3) the adverse employment action occurred under circumstances which give rise to an inference of discrimination.  Freeman, 333 F. Supp.2d at 1129.  Defendant concedes the first element of a prima facie case, i.e. that plaintiff, who is African-American, belongs to a protected class.  As to the second element, defendant argues that summary judgment is appropriate because failure to train is not adverse employment action.[16]  Specifically, defendant contends that plaintiff has provided no evidence that management employees failed to train him, and that even if plaintiff somehow received less training than Riffey, he did not suffer adverse consequences because co-workers – not defendant – provided the extra training to Riffey and then voted plaintiff out of the lead hand position.  Defendant further

_____

[16]    Defendant also argues that the failure to train did not occur under circumstances which give rise to an inference of discrimination.  Because the Court finds that failure to train was not adverse employment action in this case, it declines to reach this argument.

argues that plaintiff's training was immaterial to his removal as lead hand. Plaintiff asserts that discrimination can be inferred because a similarly situated non-minority employee received training which he did not receive and does not further address defendant's arguments. See English v. Colo. Dep't of Corr., 248 F.3d 1002, 1011 (10th Cir. 2001) (more favorable treatment of similarly situated non-minority employee can raise inference of discrimination).

The Tenth Circuit liberally defines what constitutes an adverse employment action and requires courts to take a case-by-case approach when considering whether certain actions constitute adverse employment actions. Brazill v. Gober, No. 98-2001, 2001 WL 135833, *6-7 (D. Kan. Feb. 14, 2001). Conduct constitutes an adverse employment action if it involves a significant change in plaintiff's employment status. Pendelton v. Univ. of Kan. Med. Ctr., 2006 WL 83441, at *7 (D. Kan. Jan. 11, 2006). While conclusory claims involving lack of training do not sufficiently allege an adverse employment action, failure to train may constitute adverse employment action under some circumstances. See, e.g., Brazill, 2001 WL 135833, at *7; Wright v. C & M Tire, Inc., 545 F. Supp.2d 1191, 1202-03 (D. Kan. 2008) (failure to train which puts continued employment at risk sufficient adverse employment action). Failure to train can constitute an adverse employment action when a supervisor purposefully fails to train a minority employee, disciplines him for not knowing how to perform the task and then terminates his employment for not knowing how to perform a task on which he had been denied training. Wright, 545 F. Supp. 2d at 1203. None of these circumstances aply to plaintiff's lack of training for the lead hand position.

Here, plaintiff presents no evidence which demonstrates that a supervisor denied him training. At best, plaintiff's evidence is that Jones and other unidentified co-workers failed to adequately train him for the lead hand position. None of these employees supervised plaintiff and

they did not have the ability to remove him as lead hand. Plaintiff also testifies that Riffey, Patterson and Hoefstadler (none of whom supervised him or were responsible for training him) voted him out of the lead hand position. Plaintiff presents no evidence that defendant purposefully denied him training or knew that subordinate employees were doing so. Indeed, plaintiff's own testimony was that Riffey wanted the lead hand position for himself and wanted to "outdo" plaintiff. Accordingly, the Court cannot find that the alleged lack of training by plaintiff's co-workers constituted actionable adverse employment action by defendant. Juarez v. Utah, 263 Fed. Appx. 726, 737 (10th Cir. 2008) (co-worker hostility or retaliatory conduct not adverse action unless employer orchestrated or knew about and acquiesced in it). The Court therefore finds that plaintiff has not met his prima facie burden and that defendant is therefore entitled to summary judgment on plaintiff's failure to train claim.

     2.    <u>Counseling, Discipline and Termination</u>

As to counseling, discipline and termination, in order to establish a prima facie case plaintiff must demonstrate that (1) he belongs to a protected class, (2) he was doing satisfactory work; (3) defendant disciplined him and terminated his employment; and (4) the discipline and termination occurred under circumstances which give rise to an inference of unlawful discrimination. <u>Plotke</u>, 405 F.3d at 1099-1100; <u>Jones v. Denver Post Corp.</u>, 203 F.3d 748, 753 (10th Cir. 2000). As noted, defendant concedes that plaintiff belongs to a protected class. It also concedes that it terminated plaintiff's employment, which is adverse employment action. Defendant seeks summary judgment, however, because it contends that the counseling and discipline do not qualify as adverse employment actions and that as a matter of law, plaintiff cannot establish the other two elements of a prima facie claim: that he was doing satisfactory work and that his termination occurred under

circumstances which give rise to an inference of discrimination.

Specifically, defendant argues that plaintiff offers no evidence that race was a motivating factor – let alone any factor – in its decisions to counsel and discipline plaintiff and terminate his employment. Defendant further argues that plaintiff's circumstantial evidence does not demonstrate that he received less favorable treatment than similarly situated employees or otherwise support an inference of discrimination. To demonstrate that his adverse treatment occurred under circumstances which give rise to an inference of discrimination, plaintiff identifies five pieces of circumstantial evidence: (1) defendant counseled him but not co-workers for alleged misconduct; (2) defendant gave false explanations for placing him on Steps 2 and 3 and provided insufficient training for him to perform lead hand duties; (3) defendant did not follow its progressive discipline policy at Steps 3, 4 and 5; (4) defendant offered implausible, inconsistent, incoherent or contradictory reasons for placing plaintiff on Step 2; and (5) defendant deviated from normal company procedure when Keefe counseled plaintiff for alleged sexual harassment on January 14, 2008 but Baer did not correct his employment record until April, 2008, after defendant fired him.

        a.     Prima Facie Case

           i.     Adverse Employment Action

Defendant argues that neither counseling nor discipline qualify as adverse employment action. In progressive discipline cases, discipline has a clear impact and a cumulative effect on future disciplinary measures. See, e.g., Lake v. AK Steel Corp., No. 03-517, 2006 WL 1158610, at * 33 (W.D. Pa. May 1, 2006). Accordingly, for purposes of this motion, plaintiff's cumulative discipline and termination qualify as adverse employment action. On the other hand, counseling does not generally amount to an adverse employment action because it does not affect the terms and

conditions of employment. <u>Fortner v. State of Kansas</u>, 934 F. Supp. 1252, 1267 (D. Kan. 1996). Plaintiff identified five instances of counseling: (1) on May 31, 2007, Keefe counseled plaintiff for workmanship; (2) on June 16, 2007, Keefe and Prescott counseled plaintiff for workmanship because of a pinched bead and documented the counseling on plaintiff's attendance card but later crossed it out; (3) on September 11, 2007, Prescott counseled plaintiff about defendant's zero tolerance policy against harassment after another employee said plaintiff called him gay; (4) on November 13, 2007, Carcamo counseled plaintiff for workmanship and (5) on January 14, 2008, Keefe counseled plaintiff about his conduct with a female associate and told him if it happened again he would be subject to Step III for harassment, which Keefe noted on plaintiff's attendance card. While the counseling on January 14, 2008 notes a threatened "Step III" for future harassment, the record does not reveal how harassment may be addressed through the Step disciplinary process. On this record plaintiff has not shown a genuine issue of material fact whether the cited counseling had any effect on the Step disciplinary process which culminated in the termination of his employment. On this record, as a matter of law, defendant's counseling of plaintiff does not qualify as an adverse employment action.

ii.     <u>Satisfactory Work Performance</u>

Defendant argues that as a matter of law, plaintiff cannot establish a prima facie case because he was not performing his job duties properly. Specifically, defendant cites plaintiff's progression through the progressive disciplinary Steps, which ultimately caused it to terminate plaintiff's employment. Plaintiff admits performance mistakes but testifies that he performed his job satisfactorily and contends that defendant disciplined him for workmanship errors which involved tires that were not his.

Plaintiff can meet this prong of a prima facie case by his own testimony that his work was

satisfactory, even when this claim is disputed by his employer. MacDonald v. E. Wyo. Mental Health Ctr., 941 F.2d 1115, 1121 (10th Cir. 1991); Beaird, 145 F.3d at 1166 n.3. Defendant's subjective reasons for terminating plaintiff's employment are more properly considered at the pretext stage, not the prima facie stage. Thomas, 111 F.3d at 1150-11. Plaintiff has met his light prima facie burden to show a genuine issue of material fact with respect to satisfactory work performance.

### iii. Circumstances Which Give Rise To Inference Of Discrimination

Plaintiff asserts that he establishes a prima facie case with respect to discipline and termination because similarly situated non-minority employees received more favorable treatment than he did. See English, 248 F.3d at 1011 (dissimilar treatment of protected and non-protected employees may give rise to inference of discrimination). As evidence of dissimilar treatment, plaintiff points out that (1) Keefe counseled him for a buckled bladder when he did not counsel Riffey, (2) Prescott counseled plaintiff for harassment when he did not counsel Riffey and Patterson, and (3) Keefe counseled him for alleged sexual harassment.[17] Plaintiff argues that this dissimilar treatment supports an inference of discrimination.

To the extent plaintiff testifies that Keefe counseled him but not Riffey for a buckled bladder, this single example of dissimilar treatment does not raise an inference of discrimination with respect to plaintiff's discipline or the termination of his employment. Keefe, who counseled plaintiff, did not impose discipline or termination for the incident and was not involved in any other decisions to discipline or terminate plaintiff. See, e.g., Ingram v. Giant Food, Inc., 187 F. Supp.2d 512, 516 (D.

---

[17] Plaintiff cites counseling both as an adverse employment action and as evidence of dissimilar treatment to support an inference of discrimination.

Md. 2002) (single instance of allegedly dissimilar disciplinary treatment without context evidence to show how employer typically disciplines similar conduct insufficient to establish inference of racial discrimination). Further, the record indicates that Prescott in fact counseled Riffey and Patterson – in addition to plaintiff – for alleged harassment. Finally, plaintiff presents no evidence that defendant treated him differently from other employees when Keefe counseled him for sexual harassment in January, 2008. The record shows only that Keefe counseled plaintiff, that McCauley investigated and that defendant later cleared plaintiff of wrongdoing.

Plaintiff argues that discrimination can be inferred from evidence of disturbing procedural irregularities, defendant's failure to follow its own policies and false explanations for placing him on Steps 2 and 3. Specifically, plaintiff points to evidence that defendant testified inconsistently about the role which the November 5 scrap report played in his placement on Step 2; relied on blacked out pc cards and ignored plaintiff's protestations that the tires were not his when placing him on Steps 2 and 3; and did not follow its progressive discipline policy at Steps 4 and 5.

Evidence of the falsity of the employer's explanation can be used at the prima facie stage if the trier of fact could infer from it that the employer is covering up a discriminatory purpose. See Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1151 (10th Cir. 2008) (citing Mickelson v. New York Life Ins. Co., 460 F.3d 1304, 1317 (10th Cir. 2006) (evidence that defendant offered false reason for taking adverse action, coupled with reasonable proximity between protected conduct and adverse action, supported prima facie inference of retaliation) and Wells v. Colo. Dept. of Transp., 325 F.3d 1205, 1218 (10th Cir. 2003) (evidence that employer lied to mask true unlawful purpose for adverse act coupled with other evidence supported prima facie inference of retaliation)). Id.

Plaintiff testified that the workmanship errors for which he was disciplined were either not serious or were not committed by him, and that defendant offered implausible, inconsistent, incoherent or contradictory reasons for placing him on Step 2, i.e. that defendant testified inconsistently about whether it relied on the November 5 scrap report when it placed him on Step 2.[18] The Court agrees that from this evidence a jury could infer discriminatory motive.

Plaintiff's circumstantial evidence that defendant did not follow its progressive discipline policy at Steps 4 and 5 also supports an inference of discrimination. Plaintiff can show pretext with evidence that defendant deviated from its policies and procedures. See, e.g., Doebele v. Sprint/United Mgt. Co., 342 F.3d 1117, 1138 (10th Cir. 2003) (co-worker's testimony that defendant engaged in disturbing procedural irregularities which resulted in disciplinary action, coupled with other evidence evidence of pretext); Kendrick, 220 F.3d at 1230 (pretext typically shown with evidence that defendant stated false reason for adverse employment action, acted contrary to a written company policy prescribing action to be taken by defendant or acted contrary to unwritten policy or company practice when making adverse employment decision). The record reveals that defendant deviated from its written disciplinary procedures at Step 4, when it did not offer plaintiff a chance to write an explanatory letter and at Step 5, when it did not give him a two-day cool off period. Plaintiff has therefore raised a genuine issue of material fact whether because of race,

_____

[18]     In its position statement to the Kansas Human Rights Commission, defendant stated that the November 5 scrap report resulted in plaintiff's placement on Step 2, and Prescott initially testified that the November 5 scrap report caused him to place plaintiff on Step 2. Prescott later revised his testimony and stated that the October 22 scrap report – not the November 5 scrap report – caused the step and that he did not discipline plaintiff for the November 5 report. Defendant now states that the position statement mistakenly cited the November 5 report instead of the October 22 report.

defendant disciplined him and terminated his employment.[19]

    b.  <u>Legitimate Non-Discriminatory Reason</u>

  Because plaintiff has established a prima facie case with respect to discipline and termination, defendant has the burden to articulate a legitimate, nondiscriminatory reason for disciplining and terminating plaintiff. <u>Pinkerton v. Colo. Dept. of Transp.</u>, 563 F.3d 1052, 1064 (10th Cir. 2009). As a legitimate non-retaliatory explanation for its decisions, defendant states that plaintiff committed serious workmanship errors which resulted in step discipline and ultimate termination. Poor work performance is a legitimate nondiscriminatory reason to terminate employment. <u>Johnson v. Outback Steakhouse of Fla.</u>, 328 F Supp. 2d 1115, 1122 (D. Kan. 2004). Defendant therefore meets its burden.

  3.  <u>Pretext</u>

  Because defendant has articulated a legitimate nondiscriminatory reason for disciplining plaintiff and terminating his employment, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." <u>Id.</u> at 1120. To show pretext, plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. <u>Id.</u>

---

    [19]  Plaintiff's argument that defendant deviated from normal company procedure when removing harassment counseling notation from his record in 2008 does not, however, support an inference of discrimination. With respect to the counseling notation, plaintiff suggests that the time which Baer took to remove the notation after McCauley asked him to do so constitutes a "disturbing procedural irregularity" from which a jury could infer discriminatory animus. Plaintiff presents no evidence that the delay was unusual, however, or in any other way improper.

As evidence of pretext, plaintiff points to evidence that defendant testified inconsistently about the role which the November 5 scrap report played in his placement on Step 2; relied on blacked out pc cards and ignored plaintiff's protestations that the tires were not his when placing him on Steps 2 and 3; and did not follow its progressive discipline policy at Steps 3, 4 and 5. Specifically, as noted, plaintiff testifies that the workmanship errors for which he was disciplined were either not serious or were not committed by him. From this, plaintiff argues that the stated reason for discipline – workmanship errors – was false. Plaintiff also points to defendant's inconsistent testimony about whether it relied on the November 5 scrap report when it placed him on Step 2.

As noted, plaintiff's circumstantial evidence that defendant did not follow its progressive discipline policy at Steps 4 and 5 supports an inference of discrimination. In some circumstances, plaintiff can show pretext with evidence that a defendant deviated from its policies and procedures. See, e.g., Doebele, 342 F.3d at 1138; Kendrick, 220 F.3d at 1230. The record reveals that defendant deviated from its written disciplinary procedures when, at Step 4, it did not offer plaintiff a chance to write an explanatory letter and at Step 5 it did not give him a two-day cool off period. This evidence also supports an finding of pretext.

On this record, a reasonable jury could find that defendant discriminated against plaintiff when it disciplined him and terminated his employment. Viewing the evidence in a light most favorable to plaintiff, the record reveals a genuine issue of material fact on this issue and defendant is not entitled to summary judgment on this portion of Count I.

**B.      Hostile Work Environment (Count II)**

Plaintiff claims that he suffered a hostile work environment when co-workers and supervisors

made offensive comments which included the words "spearchucker," "black cracker" and "white nigger," engaged in offensive conduct (which included writing his initials on a safari magazine and racial graffiti in the bathroom, falsely accusing him of sexual harassment, tampering with his locker and tools, sabotaging his work product) and unfairly disciplined him. Plaintiff also claims that production managers and Human Resources personnel did not take reasonable remedial action when he complained. Defendant argues that it is entitled to summary judgment because plaintiff has not demonstrated that any harassment was based on race or was sufficiently severe or pervasive to create an abusive working environment and that as a matter of law, the record reveals no basis for imputing liability to defendant. Defendant also argues that it reacted properly to plaintiff's complaints and that plaintiff's failure to follow defendant's policies and procedures precludes his claim.

Under Title VII of the Civil Rights Act of 1964, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff may establish a violation of Section 1981 and Title VII by proving that discrimination based on race created a "hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To establish a prima facie case of hostile work environment, plaintiff must show that (1) he is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on race; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. See Hurde v. Jobs Plus-Med, 299 F. Supp. 2d 1196, 1211 (D. Kan. 2004).

To prevail under a hostile work environment theory, plaintiff must show that

racially-oriented conduct had the purpose or effect of unreasonably interfering with his work performance or created an intimidating, hostile or offensive working environment. Id. The existence of such an environment can only be determined by looking at the totality of the circumstances in the work place, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The Court evaluates these factors from both a subjective and an objective viewpoint. Id. The Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. Id..

For a hostile environment claim to survive a summary judgment motion, plaintiff must show that a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule and insult, that was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001) (quoting Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998)). The Court judges that atmosphere both objectively and subjectively, looking at all the circumstances "from the perspective of a reasonable person in the plaintiff's position." Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). The severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact. Id.

    1.    Prima Facie Case Of Hostile Work Environment

Defendant argues that it is entitled to summary judgment because plaintiff fails to meet three of the elements required to establish a prima facie case of hostile work environment: that the

harassment was based on race; that the harassment was sufficiently severe or pervasive to create an abusive working environment; and that some basis exists for imputing liability to the employer. <u>See Hurde</u>, 299 F. Supp. 2d at 1211.

a.    <u>Racial Animus</u>

Regarding the requirement that the harassment must be based on race, defendant argues that because plaintiff identified only a few incidents of overt racial language and the harassment about which he complained showed no racial animus, he has not established that the harassment which he experienced was racially motivated. <u>See Chavez v. New Mexico</u>, 397 F.3d 826, 831 (10th Cir. 2005) (two racially offensive remarks not "steady barrage" required for hostile environment claim; plaintiff's status as department's sole ethnic minority not enough to demonstrate racial animus).

Plaintiff counters that he provided evidence of racial slurs directed at him by Patterson and Riffey ("white nigger" and "black cracker"), racial slurs said in his presence by Keefe and another employee ("spearchucker"), racial graffiti, and a safari magazine with photographs of a monkey and the words "JR scab" written on it. He also contends that facially neutral abusive conduct about which he complained – a confrontation with Riffey over the seat, repeated hiding of tools, voting to oust him as lead hand, and unwarranted and unfair counseling notations by Keefe – supports a finding of racial animus when viewed in the context of overtly discriminatory conduct by Riffey and Keefe. <u>Herrera v. Lufkin Ind., Inc.</u>, 474 F.3d 675, 682 (10th Cir. 2007) (conduct that appears racially-neutral in isolation may be race-based, but may appear so only when viewed in context of other race-based behavior).

Two Tenth Circuit cases – <u>Tademy v. Union Pac. Corp.</u>, 520 F.3d 1149 (10th Cir. 2008), and <u>Avila v. Jostens, Inc.</u>, 316 Fed. Appx. 826 (10th Cir. 2009) – are instructive on this score. In

both cases, the Tenth Circuit overturned decisions which had granted summary judgment in favor of defendants.  Both cases examine evidence which is sufficient to demonstrate racial animus in Title VII and Section 1981 cases, and suggest that plaintiff has presented evidence of racial animus which is sufficient to make a prima facie case.

As evidence of racial animus, plaintiff in <u>Tademy</u> pointed to graffiti on his locker in 1996 and 1997 which said "nigger" and  "nigger go home," two racist cartoons posted on company billboards in 1997, the word "nigger" on the bathroom wall in 1998, a co-worker's reference to another African-American co-worker as "F* * *ing Kunta Kinte," finding a "Sambo" cartoon and the words "nigger swimming pool" by an arrow pointing to the toilet in 2000, being called "boy" by a manager in 2001, and an apparent noose displayed in the workplace in 2003.  520 F.3d at 1153-54, 1172.  The Tenth Circuit concluded from plaintiff's evidence that a jury could rationally find racial animus.  It therefore reversed the district court grant of summary judgment on that ground. <u>Id.</u>  Similarly, plaintiff in <u>Avila</u> presented the following circumstantial evidence of animus in a disparate treatment context: his supervisor's statement that plaintiff should learn to "speak American" and a co-worker's testimony that around the same time defendant fired plaintiff, his supervisor said that plaintiff should "get out of the country or go back to Mexico" if he could not speak English. 316 Fed. Appx. 826, 832-33.

As with <u>Tademy</u> and <u>Avila</u>, a jury in this case could rationally find racial animus from plaintiff's evidence of racial slurs, racial graffiti in the restroom and his initials on the safari magazine, and co-worker harassment which was facially race neutral.  Plaintiff in <u>Tademy</u> presented evidence of one or two events per year which cumulatively portrayed animus; plaintiff here presents fewer specific pieces of evidence, but the events which he cites occurred during a much shorter

period of time. The Court concludes that plaintiff has therefore shown sufficient prima facie racial animus and overrules defendant's motion on that ground.

        b.    <u>Severity/Pervasiveness</u>

Regarding the requirement that the harassment must be severe or pervasive, defendant argues that plaintiff identified only four incidents which are isolated and do not amount to a "steady stream" of offensive conduct sufficient to establish severity or pervasiveness. <u>See</u> <u>Chavez</u>, 397 F.3d at 831. Specifically, defendant notes Keefe's "spearchucker" comment, the comment about black people in relationship to the stick figure drawings, racial graffiti in the restroom, and the safari magazine with photographs of a monkey and the words "JR scab" written on it. Defendant argues that plaintiff's testimony about other racial comments happening "all the time" is too vague to demonstrate severity or pervasiveness, and that because plaintiff testified that he was not bothered by the comments and did not report them to management, he cannot show that the harassment unreasonably interfered with his job. <u>Ford v. West</u>, 222 F.3d 767, 778 (10th Cir. 2000) (without referring to specific dates or circumstances, claim that racial slurs were used "continuously" is vague and conclusory and does not create genuine issue of material fact); <u>Russell v. Midwest-Werner & Pfleiderer, Inc.</u>, 949 F. Supp. 792, 798 (D. Kan.1996). Plaintiff counters that he provided evidence of racial slurs directed at him by Patterson and Riffey, racial slurs said in his presence by Keefe and another employee, racial graffiti and his initials on the safari magazine. He also contends that facially neutral abusive conduct about which he complained – particularly the confrontation with Riffey over the seat which occurred days after Riffey used a racial slur and which made plaintiff feel physically threatened – is particularly severe. Finally, plaintiff argues that he can use evidence of a general work atmosphere to show pervasiveness and that neutral conduct can be animus if it is

combined with overt racial conduct.

Pervasiveness and severity are independent and equal grounds upon which plaintiff may establish this element of a hostile environment claim. Witt v. Roadway Exp., 136 F.3d 1424, 1432 (10th Cir. 1998). The two grounds "are, to a certain degree inversely related; a sufficiently severe episode may occur as rarely as once . . . , while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." Cerros v. Steel Techs., Inc., 288 F.3d 1040, 1047 (7th Cir. 2002). The Court considers the frequency and severity of the conduct, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the plaintiff employee's work performance. Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007). The inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact." Herrera, 474 F.3d at 680 (internal quotation marks omitted).

Tademy is again instructive with respect to severity and pervasiveness. There, the Tenth Circuit considered the cumulative weight of several "isolated" racial comments and concluded that the record supported a finding of both severity and pervasiveness. 520 F.3d at 1162. Specifically, the Tenth Circuit focused on graffiti and cartoons combined with the words "nigger" and "nigger go home" etched on plaintiff's locker would make any reasonable person feel uncomfortable and unwelcome in the workplace. Id. (citing Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)("no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' . . . ")). No "magic number" of slurs indicates a hostile work environment, but an unambiguously racial epithet falls on the more severe end of the spectrum. Id. (citing Cerros, 288 F.3d at 1047). In reversing the district court grant of summary judgment, the Tenth Circuit in Tademy was persuaded that plaintiff, who had been affected so

profoundly that he had not returned to work for defendant, had sufficiently demonstrated severity and pervasiveness through a series of acts of harassment which culminated in a life-sized lynching noose. Id.

Here, plaintiff identified several instances where co-workers made racially hostile statements in his presence, as well as racial graffiti and a safari magazine on which his initials were written. These events occurred during a period of several months. Plaintiff identified at least one instance – the altercation with Riffey – during which he felt physically threatened. Plaintiff in Tademy alleged a series of acts of harassment which occurred over an eight-year period, and presented evidence of one or two events per year which cumulatively portrayed animus. Plaintiff here presents fewer specific pieces of evidence, but the events which he cites occurred during a much shorter period of time. Further, plaintiff's testimony that he "blew off" some racial comments and ignored them does not negate the fact that he found other comments and actions hostile. While it may be a close call, the Court concludes that a reasonable jury could find that the harassment which plaintiff experienced was both severe and pervasive. The Court concludes that plaintiff has therefore shown sufficient prima facie evidence of severity or pervasiveness and overrules defendant's motion on that ground.

    2.    <u>Proper Remedial Action</u>

Defendant seeks summary judgment because if plaintiff has established a hostile work environment, it properly reacted to plaintiff's complaints and the law does not impute liability to it. Defendant contends that it took proper remedial action and avoids liability because when plaintiff complained to McCauley, the harassment stopped and McCauley heard no further complaints from plaintiff, who never reported harassment by way of "The Network" or any other channel.

Conduct creating a hostile work environment is within the scope of employment for purposes of employer liability (1) if the supervisor's harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment (in which case the employer has no affirmative defense) or (2) absent a tangible employment action unless the employer can prove that it (a) exercised reasonable care to prevent and correct promptly the harassing behavior and (b) the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer.  Pinkerton, 563 F.3d at 1058-59 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998)).[20]  This is known as the Faragher defense.

Defendant contends that the harassment did not culminate in a "tangible employment act" and that plaintiff did not take advantage of many of defendant's anti-harassment policies and reporting procedures.  Plaintiff concedes as much.  The parties disagree, however, about whether defendant "exercised reasonable care to prevent and promptly corrected the harassing behavior about which plaintiff complained."

Viewing the evidence in a light most favorable to plaintiff, the record reveals a genuine issue of material fact about whether defendant exercised reasonable care to correct and prevent harassing behavior.  While plaintiff failed to report most of the harassment which he claims to have suffered, he did report to Prescott on August 21, 2007 that Patterson and Riffey had called him racist names.  Prescott held a meeting with shift employees, but he thought they were "playing around" and he did not report the meeting to the human resources department.  Also, he did not counsel Riffey or

_____

[20]　　An employer can also be found directly liable for a supervisor's harassment if the supervisor engages in the harassment to serve the employer or has such a high rank as to be the employer's alter ego.  Pinkerton, 563 F.3d at 1059.  Plaintiff does not argue that defendant is directly liable on either of these grounds.

Patterson about the comments. Further, plaintiff reported racially-based locker-gluing to human resources manager Greathouse, who did not document whether he investigated plaintiff's complaint. Finally, plaintiff complained to McCauley about harassment multiple times. McCauley attributed the harassment to plaintiff's status as a "scab" and investigated some of the conduct. However, despite plaintiff complaining that the harassment was racially-motivated, and despite McCauley's impression that plaintiff was at least partially correct about that, he focused his investigation on the "scab" harassment and never talked about it with Prescott, plaintiff's immediate supervisor at the time.

Here, in light of all of the circumstances, a jury could find that plaintiff suffered a hostile work environment. A reasonable jury could also find that Human Resources personnel did not take reasonable remedial action when plaintiff complained. Accordingly, the Court overrules defendant's motion on this defense.

## C.    Retaliation (Count III)

Title VII forbids employers from discriminating against an employee for opposing an employment practice made unlawful by Title VII. <u>Pinkerton</u>, 563 F.3d at 1054 (citing 42 U.S.C. § 20003-3(a)). Plaintiff claims that because he complained of racial harassment, defendant retaliated by (1) failing to adequately train him and (2) disciplining him and terminating his employment. Defendant seeks summary judgment, arguing that plaintiff has not shown that he complained about discrimination or that a causal connection exists between plaintiff's complaints and his discipline and termination. Defendant also cites plaintiff's repeated workmanship errors as a legitimate nondiscriminatory reason for its decision to discipline. Finally, defendant contends that the adverse actions about which plaintiff complains were taken by management employees who did not know

-43-

that plaintiff had complained about harassment.

To establish a prima facie case of retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) he suffered materially adverse action contemporaneous with or subsequent to such activity; and (3) a causal connection existed between the protected activity and the materially adverse action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006); Knight v. City of Prairie Village, Kan., 06-2299-KHV, 2008 WL 474257, at *8 (D. Kan. Feb. 19, 2008). Unlike in disparate treatment cases, a materially adverse action for purposes of a retaliation claim need not affect the employee's terms and conditions of employment; rather, plaintiff must show that the challenged action could dissuade a reasonable employee from making or supporting a charge of discrimination. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). A causal connection may be shown with evidence of circumstances which justify inference of retaliatory motive, such as protected conduct followed closely by adverse action. Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004). Standing alone, temporal proximity between the protected activity and the retaliatory conduct must be very close in time. O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). Otherwise, "plaintiff must offer additional evidence to establish causation." Id.

If plaintiff establishes a prima facie case, defendant has the burden to articulate a legitimate, nondiscriminatory reason for adverse action. Pinkerton, 563 F.3d at 1064. If the employer does so, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." Id. Again, while plaintiff here affirmatively invokes the mixed-motive theory, in this case it adds nothing to his theory of liability or to the Court's analysis.

-44-

As evidence of protected conduct, plaintiff cites his complaints about racial harassment to Prescott on August 21, 2007, to McCauley on December 5, 2007 and to other unspecified managers and human resources representatives which he made "all the time." As evidence of materially adverse action plaintiff cites defendant's (1) failure to adequately train him and (2) decisions to discipline and ultimately terminate his employment.[21] As evidence of causal connection, plaintiff relies on the same five pieces of circumstantial evidence which he argues as proof of a discriminatory motive: (1) defendant counseled him but not co-workers for alleged misconduct in May or June of 2007, when Keefe counseled him for a buckled bladder when he did not counsel Riffey, in September of 2007 when Prescott counseled him for harassment but did not counsel Riffey and Patterson, and January of 2008 when Keefe counseled him for alleged sexual harassment; (2) defendant provided insufficient training for him to perform lead hand duties and gave false explanations for placing him on Step 2 on October 22, 2007, and Step 3 on December 10, 20007; (3) defendant did not follow its progressive discipline policy when it placed plaintiff on Step 3 on December 10, 2007, Step 4 on January 7, 2008, and Step 5 on March 3, 2008; (4) defendant offered implausible, inconsistent, incoherent or contradictory reasons for placing plaintiff on Step 2 on October 22, 2007; and (5) defendant deviated from normal company procedure when Keefe counseled plaintiff for alleged sexual harassment on January 14, 2008 but Baer did not correct his employment record until April, 2008, after defendant fired him. In addition, plaintiff relies on the close temporal proximity between his protected conduct and defendant's adverse actions.

     1.     Prima Facie Case

---

[21]     For purposes of plaintiff's retaliation claim, defendant does not argue that plaintiff cannot show adverse action.

a.      Protected Opposition

Defendant argues that the record contains no evidence that plaintiff engaged in protected opposition because he did not use the hotline to file a formal complaint and because his harassment complaint to McCauley implicated his status as a scab more than his race. Formal complaints, however, are not required to establish protected opposition; informal complaints to superiors about discrimination and harassment constitute protected activity. O'Neal, 237 F.3d at 1255. Further, the record indicates two specific instances where plaintiff complained to management about racial harassment: (1) on August 21, 2007, plaintiff complained to Prescott that a week earlier, Patterson had called him a "black cracker," and (2) on December 5, 2007 plaintiff complained to McCauley about racial harassment. In addition, on other unspecified occasions, plaintiff complained to managers and human resources personnel about harassment and discrimination. The extent to which plaintiff's harassment complaint to McCauley on December 5 implicated his status as scab more than his race is a question for the jury. Here, a reasonable jury could infer that plaintiff engaged in protected opposition on at least two occasions.

b.      Causal Connection

With respect to causal connection, defendant argues that even if plaintiff engaged in protected opposition, he has not shown that it was caused his discipline or the termination of his employment.[22] Defendant's motion and briefs do not address plaintiff's complaint about harassment on August 21, 2007. Therefore defendant is not entitled to summary judgment on that question or that of other complaints on unspecified dates. Defendant's motion focuses on plaintiff's complaint

---

[22]      Defendant's motion and briefs are silent as to plaintiff's first alleged adverse action: that defendant failed to adequately train plaintiff in retaliation for his complaints about harassment and discrimination. The Court therefore does not address this alleged adverse action.

of December 5, 1007. Specifically, defendant argues that it is entitled to summary judgment because (1) it counseled and disciplined plaintiff for workmanship errors before December 5, 2007, (2) the managers who disciplined plaintiff on December 10, 2007, and January 7, 2008 did not know about plaintiff's complaints of harassment; (3) plaintiff's retaliation claim is barred by his acceptance of responsibility for the workmanship errors which resulted in Steps 4 and 5; and (4) three months lapsed between plaintiff's complaint on December 5, 2007, and his termination on March 3, 2008. See Walker v. Runyon, 979 F. Supp. 1363, 1370 (D. Kan. 1997) (counseling and discipline which occurs before protected conduct negates inference of causal connection); Hysten v. Burlington Northern and Santa Fe Ry. Co. 296 F.3d 1177, 1184 (10th Cir. 2002) (no inference of discrimination when manager who took adverse action did not know about protected opposition); Desmarteau v. City of Wichita, Kan., 64 F. Supp. 2d 1067 (D. Kan. 1999) (no inference of discrimination when plaintiff acknowledges workmanship errors); and Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three month period insufficient to infer causation); Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997) (same).

             i.       Discipline And Counseling Which Occurred Before December 5, 2007

Defendant argues that it counseled and disciplined plaintiff for workmanship errors before December 5, 2007 and that this fact negates any causal connection between plaintiff's protected conduct and subsequent discipline. Walker, 979 F. Supp. at 1370. Defendant, however, ignores plaintiff's complaint to Prescott about racial harassment on August 21, 2007. Defendant's argument is therefore misplaced. Furthermore, Walker does not broadly hold that prior discipline and termination automatically negate a causal connection between protected conduct and subsequent

discipline. <u>Walker</u> simply notes that positive evaluations before plaintiff's complaint and negative reviews thereafter might show a retaliatory motive, but no such motive can be inferred when negative reviews occurred throughout plaintiff's employment. <u>Id.</u>

        ii.      <u>Pre-Termination Discipline Given By Managers Who Did Not Know About Protected Conduct</u>

Defendant argues that summary judgment is proper because Prescott placed plaintiff on Step 3 on December 10, 2007 and the record contains no evidence that he knew that plaintiff had engaged in protected activity on December 5, 2007. As noted, plaintiff met with McCauley on December 5, 2007. The next day, McCauley and Baer decided to have Prescott "check with Spencer nightly for problems" related to locker gluing, missing tools or other harassment. The record does not expressly indicate that they told Prescott about plaintiff's complaints, but a reasonable jury could infer as much. Because Prescott placed plaintiff on Step 3 only five days later, a jury could also infer a causal relationship between plaintiff's protected activity and Prescott's decision to place him on Step 3. Further, Prescott knew about plaintiff's complaint on August 21, 2007, and placed him on Step 1 less than a month later. The close proximity between plaintiff's complaint to McCauley and his placement on Step 3 and plaintiff's complaint to Prescott and his placement on Step 1 raises a genuine issue of material fact with respect to causation, notwithstanding plaintiff's previous workmanship errors.

Defendant also argues that plaintiff presented no evidence that Scott Downing, the manager who placed plaintiff on Step 4, knew about plaintiff's harassment complaints. Plaintiff presents no evidence that Downing knew about his protected conduct, and plaintiff concedes that he committed the workmanship errors which resulted in his placement on Step 4. While defendant deviated from

its written disciplinary procedures by not affording plaintiff an opportunity to write an explanatory letter at Step 4, defendant's evidence that Downing did not know about plaintiff's harassment complaint, coupled with plaintiff's admission that he committed the errors negates an inference of causal connection with respect to Step 4.

The Court therefore finds that with respect to Step 4, plaintiff has not met his prima facie burden and that defendant is therefore entitled to summary judgment on this portion of plaintiff's retaliation claim.

### iii.    Plaintiff's Acknowledgment Of Workmanship Errors

Defendant argues that plaintiff accepted responsibility for the workmanship errors which caused defendant to place him on Step 5, thereby negating his claim that Step 5 occurred because of retaliation. See Desmarteau, 64 F. Supp. 2d at 1081. Plaintiff relies upon temporal proximity and the five noted pieces of circumstantial evidence which he contends support an inference of retaliatory motive sufficient to support a causal connection.

For the same reasons articulated in its disparate treatment analysis, the Court finds that plaintiff's five pieces of evidence support an inference of retaliatory motive. Specifically, the record reveals that defendant deviated from its written disciplinary procedures when it did not offer at Step 5 it did not give him a two-day cool off period. This evidence supports an inference of retaliatory motive, and the fact that plaintiff admitted the workmanship errors does not negate an inference of retaliatory motive in the face of this evidence.

### iv.    Proximity Of Protected Conduct And Termination

Finally, defendant argues that the three months between plaintiff's harassment complaint on

December 5, 2007, and plaintiff's placement on Step 5 on March 3, 2008 and subsequent termination of employment on March 12, 2008 negate any causal connection. <u>See</u>, <u>e.g.</u>, <u>Richmond</u>, 120 F.3d at 209 (three month period insufficient to infer causation); <u>Conner</u>, 121 F.3d at 1395 (same). To counter defendant's arguments, plaintiff relies upon temporal proximity and the five noted pieces of circumstantial evidence which he contends support an inference of retaliatory motive sufficient to support a causal connection.

For the same reasons articulated in its disparate treatment analysis, the Court finds that plaintiff's five pieces of evidence support an inference of retaliatory motive. Specifically, the record reveals that defendant deviated from its written disciplinary procedures when, at Step 5, it did not give him a two-day cool off period. This evidence also supports an inference of retaliatory motive.

2.    <u>Legitimate Non-Discriminatory Reason</u>

Because plaintiff has established a prima facie case of retaliation as to Steps 1, 2, 3 and 5, defendant has the burden to articulate a legitimate, nondiscriminatory reason for disciplining and terminating plaintiff. <u>Pinkerton</u>, 563 F.3d at 1064. As a legitimate non-retaliatory explanation for its decisions, defendant argues that plaintiff committed serious workmanship errors which resulted in step discipline and ultimate termination. Poor work performance is a legitimate nondiscriminatory reason to terminate employment. <u>Johnson</u>, 328 F Supp. 2d at 1122. Defendant therefore meets its burden.

3.    <u>Pretext</u>

Because defendant has articulated a legitimate nondiscriminatory reason for disciplining and terminating plaintiff, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action." <u>Id.</u> at 1120. To

show pretext, plaintiff must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. Id.

For reasons previously stated, a reasonable jury could find that in retaliation for his complaints about harassment, defendant disciplined plaintiff at Steps 1, 2, 3 and 5 and terminated his employment on March 12, 2008. Therefore defendant is entitled to summary judgment on Count III with respect to Step 4.

**D.    Summary**

As explained above, the Court sustains defendant's motion for summary judgment with respect to plaintiff's disparate treatment claim that defendant failed to train him (Count I ) and with respect to plaintiff's retaliation claim that defendant improperly disciplined him at Step 4 (Count III). The Court overrules defendant's motion in all other respects.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion For Leave To File A Surreply Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #52) filed December 7, 2009 is hereby **SUSTAINED** and defendant's Motion For Summary Judgment (Doc. #37) filed September 28, 2009 be and hereby is **SUSTAINED** in part as noted above.

Dated this 10th day of March, 2010 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge